MONCURE, P.,
delivered the opinion of the court.
The main question arising in this case is presented by the first assignment of error in the decree appealed from: “Because it enforces a purchase made by a guardian of his ward's real estate, sold under a decree of court in a suit instituted in accordance with the provision of the statute for the sale of land of persons under disability.”
We think the appellant is right in maintaining that the sale, which is the subject of controversy in this case, was made under a decree in a suit instituted under chapter 128 of the Code of 1849, concerning the sale of lands of persons under disability, and not under a decree in a suit instituted under chapter 124, of the same Code, concerning partition of lands.
But although section 6 of chapter 128 declares that at such sale as may be made under that chapter, “the *guardian or guardian ad litem, or committee, or trustee, shall not be a purchaser, directly or indirectly,” yet that section was enacted for the benefit and protection of the persons under disability, and not of their guardians, committees or trustees. And there may be a case in which a purchase made by a guardian or other fiduciary of the land of his ward or other beneficiary, sold under that chapter, would and ought to be sustained and enforced.
We think that this is such a case.
The sale of land in this case (450 acres) was made by commissioners under a decree of the said court, made at March term, 1859. The day of sale was the 11th day of August, 1859. The terms of the sale were: “Two _ hundred and fifty dollars cash, balance in equal instalments, payable in one and two years, from 1st October, 1859, and bearing interest from that day, the purchaser to execute bonds with good security for the deferred payments.” Thomas W. Williams, the_ guardian, who, as such, brought the suit, was the highest bidder for, and became the purchaser of said land at said sale, at the price of eighteen dollars and sixty cents per acre. Onewitness (Joseph A. Jones) proved that that was a good price for the land in 1858 and 1859; and though he could not say that^ it was a very exorbitant price, yet he considered it a very fine sale. Another witness (J. B. Williams) proved that “it was an enormous price at the time, and most unquestionably was to the advantage of the children.” There is not a particle of evidence in the case at all in conflict with the testimony of either of these two witnesses. Thomas W. Williams, the highest bidder for the land, to whom as purchaser it was cried out as aforesaid, entered into possession thereof as such purchaser in October, 1859, the time from which the deferred instalments of the purchase money was to bear interest. It is stated in the deposition of Thomas W. Williams that he took possession, “notwithstanding the *protest of J. W. Williams.” It is not stated in the record what was the ground of that protest. J. B. Williams was the administrator de bonis non, with the will annexed of his mother, Mrs. Eliza J. Williams, and no doubt as such had possession of the land, and *55 was unwilling to surrender it to the purchaser until he had complied with the terms of sale. Certainly J. B. Williams did not make the said protest because he thought the price at which the land was cried out as aforesaid was inadequate; for we have seen how different from that was his testimony on the subject. Thomas W. Williams no doubt complied with the terms by making the cash payment of two hundred and fifty dollars; and he certainly did by giving bonds, with good security, for the two deferred payments, amounting each to the principal sum of $4,257.75. These bonds bear date on the - day. of October, 1860; bear interest from the first day of October, 1859, and are payable “to John E. Jones and T. H. Campbell, commissioners of the circuit court of Nottoway county, in the case of Williams’ guardian & others v. Williams & others;” one of them on demand, and the other on or before the first day.of October. 1861. The appellant, John C. Redd, and William F. Blackwell and James P. Street executed the said bonds with the said Thomas W. Williams, as his sureties and co-obligors. The said purchaser continued in quiet and uninterrupted possession of the said land, and enjoyed the issues and profits thereof from the time he look possession as aforesaid, in October, 1859, until he gave his deposition in this cause on the 24th of September, 1873; and may have ever since been, and yet be in such possession, for ought the.record shows. Neither the said Thomas W. Williams, nor any of the sureties in his bonds aforesaid, nor any other party concerned, so far as the record shows, ever questioned his right or liability as purchaser of the land aforesaid until after the institution of this suit, on the 23d *day of June, 1873. During the long period of his possession and enjoyment of the said land as purchaser as aforesaid, a period of more than fourteen years prior to the institution of this suit, it greatly depreciated in value; so that on the 24th of September, 1873, when the testimony in this cause was taken, one of the witnesses (Joseph A. Jones) did not think it would bring more than six dollars per acre, if then publicly sold upon the usual terms; and another of the witnesses (J. B. Williams) did not think it would bring more than five dollars, if then sold at public auction under decree of the court, and on the usual terms of one, two and three years. If the infant owners of the land or their heirs are to be subjected to the consequences of this great depreciation of its value, their loss therefrom would be immense, and they would be subjected to that loss by the act of their guardian, and as a result of a provision of law made for their protection. Instead of a shield of defence for which it was intended, it would be converted into a sword of destruction. For if a stranger, instead of the guardian, had been the purchaser, there could have been no doubt as to his liability.
Then is a court of chancery powerless to avert so great an evil and prevent so great a loss; to prevent wards from being made the victims of the act of their guardians? If he had not become the purchaser, there would have been another, &c., competent purchaser at the same price, or a few cents less per acre.
We are therefore of opinion that the purchaser by the guardian, under the circumstances of this case, ought to be enforced in favor of the owners of the estate, just as much as would have been a similar purchase by a disinterested person.
But it is said that no report of the sale was ever confirmed by, or ever made to the court.
That a report of the sale was made to the court, seems *to be very clear. The bonds were certainly returned to the court, among whose scattered and confused records they were found after the war. It is not perceived how they could have been returned to the court but by the commissioner who took them, or that they would have been so returned without a report, showing for what they had been taken, or why they were returned. Many of the records of the court were destroyed, and what were not destroyed were deranged and scattered by the federal army in April, 1865. It is not strange, therefore, that the report cannot be found.
That such report was never expressly confirmed by an order of court made before the institution of this suit, may be a more doubtful question. That it never was, seems to be probable from the circumstances of the case. The chancery order-book of the court has been found, containing the orders entered from 1858 to 1863 inclusive, and no order has been found in that book, where it would probably have been, if anywhere, confirming the said sale. It may probably have been confirmed after 1863, and before the end of the war.
Certain it is, that the purchaser might have had the report of sale confirmed at any time before the institution of this suit. None of the other parties interested in the land or the purchase money would have opposed it. He probably did not move in the matter because he did not choose, or was not ready to pay the purchase money, which he might have been required to do had he made any motion in the matter. The other parties interested in the land, who were mostly infants, or feme coverts, probably considered it the business of the guardian or commissioners. The commissioners were probably either dead or non-residents, or else waited for the action of the parties concerned, who were all members of the same family. That the purchaser considered himself bound *by his purchase long after it was made, is shown by the fact that about the 1st of October, 1861. he tendered the amount of his first bond to J. E. Jones, the commissioner, who would not receive it; probably because it was Confederate money. And even after the war, and so late as the 12th of March, 1866, in a deed dated on that day from Street and wife to said Thomas W. Williams, conveying to the latter the former’s interest in the estate of the said Eliza J. Williams, it is expressly stated that her land *56 and slaves had “been sold by a decree or decrees of the circuit court of the county of Nottoway, through its commissioner,” and full power was given to any person authorized to convey title to the land known as Vermont, (no doubt the tract of 450 acres aforesaid), sold as afore'said, and purchased by said Williams, so far as the interest of said Street and wife were concerned.
The appellant, Redd, who is the father-in-law of the said Thomas W. Williams, and one of his sureties and .co-obligors in the bonds given for the deferred instalments of the purchase money of the said land, might, at any time, have had the question of his liability determined by the said court. If he had had any doubt on the subject'he might, at any time, have called upon the court to confirm or set aside the said sale, but he did not choose to do so. He knew that his son-in-law was in the quiet and peaceable possession and enjoyment of the land, claiming it as purchaser as aforesaid. He has no more right now than has Thomas W. Williams to question the validity of th.e said sale.
The third error assigned in the decree appealed from is: “Because it pronounces a sale firm and stable between the parties, when by the decree of April term, 1861, pronounced in the original suit of Williams’ guardian, &c., against Street and Wife, &c., the court had, in sum and substance, set aside said sale as null and void, and ordered a resale of said land.”
*We do not think that the said decree of April term, of 1861, had any such effect, or was intended so to have. In saying that the sales decreed by the former decree (of March term, 1859), had not been concluded, it was not intended to say that the sale of the land had not been concluded, but that.the sales of the slaves.and other personal property which had been also decreed to be sold had not been concluded. The said decree of April term, 1861, was “by consent of parties by counsel,” and the plaintiff, Thomas ■W. Williams, would hardly have consented to a decree in April, .1861, affirming that the sale of the land to him was not concluded, and in October thereafter tendered to the commissioner the amount of his first bond for the purchase money of the land.
In regard to the fifth assignment of error in the decree appealed from: “Because it gives to the plaintiffs E. P. Lyon and wife, one-ninth part of the alleged purchase price of said land, with interest from October 1st, 1859, when in fact, if entitled at all, they were only entitled to one-ninth of the principal thereof, with interest from the time at which William O. Williams would have arrived at the age of twenty-one years; and it does not appear when he would have so arrived, nor was this enquired- into by the court.”
We think there is no error in the decree in this respect. The parties, doubtless, intended that the deferred instalments of the purchase money of the land, with interest from the 1st day of October, 1859. should be distributed among the parties entitled to the land in proportion to their interest therein. At the time of the decree of March term, 1859, Davis D. Williams was dead, having died in 1855 under age, unmarried and without issue; whereby his interest in the estate of his mother devolved equally on his brothers and sisters. After the rendition of that decree and the sale of the land made under it — to-wit, in 1863 — William O. Williams was killed at the battle *of Gettysburg, and was then also under age, unmarried and without issue; whereby his interest in the estate of his mother devolved equally on his brothers and sisters. In regard to the trust created by her will, in expressing a wish that the 450 acres of land aforesaid should be worked for the benefit of her three youngest children (two of whom were her said sons, David D. and William O., and the third was her daughter, Mary Augusta), and that it should be kept as a house and home for her single daughters until William O. Williams should be twenty-one years old, and then to be equally divided between said David D. and William O., it was no doubt understood and agreed that those charges upon the use of the land antecedent to the period prescribed by the will for its division as aforesaid, should be otherwise satisfied out of her estate. By a decree of the said court made on the 29th of March, 1858, among other accounts directed to be settled was an account of the administration of R. H. and T. W. Williams, as executors of said Eliza J. Williams; also an account of the administration of Joel B. Williams, as administrator de bonis non, with the will annexed, of said Eliza J. Williams; and also “an account of the receipts and disbursements of the said executors, and of the said administrator in the administration of the land and personal estate set apart by the said testatrix for. the benefit of her single daughters and five youngest children, with a statement showing what would be a fair allowance to the three youngest children for the rent of said land.” In the decree of March term, 1859, for the sale of the said land, there was a direction that a commissioner of the court should ascertain and report “what will be a fair compensation to Martha V. and Cornelia R. Williams for their right of residence in the mansion house in the bill mentioned.” The said Cornelia seems to be the same person with the appellee, C. R. *Lyon, wife of E. P. Lyon, in whose favor the decree appealed from was rendered.
This case has been argued with great ability by the counsel on both sides, who cited many books and cases in support of their respective views. The following, among others, were referred to: 1 Leading Cases in Equity, with Notes of Hare and Wallace, Fox v. Mackreth, and Pitt v. Mackreth; Davone v. Fanning, 2 John. Ch. R. 252; 2 Tucker’s Commentaries, 459; 12 Leigh 1, Moore v. Hilton; 13 Gratt. 195, Daniel, &c., v. Leitch; 20 Id. 1, Howery v. Helms, &c.; 22 Id. 378, Cline’s heirs v. Catron; Id. 573, Phelps v. Seely, &c.; 26 Id. 517, Zirkle v. McCue, &c.; 27 Id. 812, Brock v. Rice, &c.; 6 Id. 339, Talley, &c., v. Starke’s adm’r. But, without noticing them any further, it is sufficient to say that we think they sustain, while there *57 is nothing in any of them in conflict with the foregoing opinion.
Upon the whole, we are of opinion that there is no error in the said decree, and that it ought to be affirmed.
Decree affirmed.